My name is Jim Bellinger. I represent Patrick Buckner, who is one of the defendants and appellant in this case. Are you dividing argument or? 12 minutes of the 20 allotted to us. I hope to reserve approximately 20 seconds. Your honors, I propose to address three issues. The admission of what has become to be known as the Bernstein Report in this case, that's Exhibit 32A through B. An issue regarding limitations on the cross-examination of a gentleman by the name of Frank Palminteri. Lastly, and I don't plan on spending too much time on the last two issues, but I would like to address the denial of the motion to dismiss, count 28, regarding 29 tail rotor blades. We're going to ask this court to view this case through a lens of whether or not there can be any confidence in the reliability of the verdict. I realize that's a broad and amorphous standard and we have a number of different standards which address our issues, but ultimately I think that's what we have to do in this case. In my mind, the most egregious example of error in this case was, and something that we believe affected the entire case and compromised the verdict, affected every issue that we raised, is the admission of what has come to be known as the Bernstein Report. Counsel, may I just ask you about that directly? Sellings under Defendant Rule 1,006 are always prepared for litigation. Isn't the proper question whether the sales or inputs were trustworthy? And is the underlying business record summarized in the Bernstein Report which provides the guarantees of trustworthiness and reliability required by Defendant Rule 1,006? What is your response to that? I think, Your Honor, you're absolutely correct in the sense that a summary exhibit admitted under Rule 1,006 relies on the admissibility of the underlying documents, but there's also a reliability component to 1-0-0-6. If you look at 8-0-3-6, there are six components to that, the last of which is unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. And one of our arguments regarding the admission of this exhibit is that the underlying records should not have been admitted in and of themselves primarily because of lack of trustworthiness, lack of foundation on the sense that there was contemporaneous preparation by persons with knowledge. If I could go through the list of 8-0-3-6, but I'm... Because no one was introducing this report as a business record. It clearly wasn't a business record. This is why I found your briefs not very helpful. It wasn't a business record and nobody was claiming it was a business record, the report. Isn't that right? I think you could take that characterization of it, Your Honor, but I wouldn't necessarily portray it in that fashion. I think the government took this report for the specific purposes of arguing that Boeing, in this case, lost over $1.6 million. You viewed it as being based on underlying business records and being a summary under 1-0-0-6 of otherwise invisible evidence. So which piece of it are you challenging? Are you challenging the underlying records or are you challenging the summary aspect of it? Well, it would be both, Your Honor, because I don't believe the underlying records, and I don't think there's anything in the entire trial record that suggests that the underlying records would give you a loss calculation as to Boeing regarding the shipment of any one of the hundreds of parts. No, the underlying records didn't purport to. All the underlying records were, as I understand it, were a record of things that were shipped that weren't paid for. Isn't that what the record was? That's what we would say, and that's, I believe, what the examination on that issue was, that the records would not have shown any kind of loss calculation, but in direct response to a question by the trial court to the AUSA that tried the case, what do you propose to use this exhibit for? To show losses to Boeing, $1.6 or $1.7 million in losses to Boeing. We would agree with the court that it doesn't show that kind of loss, and, in fact, after the exhibit was admitted, the cross-examination, in a limited number of circumstances because you have only so much time in trial, showed that the record was not reliable to show any kind of loss to Boeing. I don't think. Some of the things that were shipped and not paid for were returns or something. We don't know because that evidence was not introduced. Some of it may have been shipped in return. You presumably have an opportunity to examine it. That's one of the requirements. You don't object if you're denied the opportunity to examine it, so presumably if you found examples that would prove contrary, you would have brought those up. Here's what ended up happening, Your Honor. There were several out-of-hearings outside of the presence of the jury on this, and there were a plea in the record. There was significant argument and evidence elicited regarding whether or not this should come in as a summary or whether these business records had any kind of foundation. The trial court ultimately determined that they did in the trial proceeding. What ended up happening as— The foundation is the issue. You don't dispute that Boeing's records are Boeing's records. Is that correct? Not in the accurate use of the term, Your Honor, but under the criteria of 8036, that argument was made repeatedly to the trial court. This was a critical issue regarding whether this exhibit would ever get in front of the jury. On the grounds of 8036, and in particular whether it was a trustworthy and reliable source, the government argued to the jury that there was a $1.7 million theft in this case. As soon as the exhibit was admitted, the very next witness that was brought on after Mr. Burnison was a gentleman by the name of Giddings, who's the director of financial services for Boeing, who testified that it's unheard of under Boeing business policies that we would ship $1.6 or $1.7 million of three parts to any of these persons. And the reason why, in closing— And my understanding was that that was really to account for Mr. Say, well, maybe some of it was legitimate, but not that much of it. But, Your Honor, the point is, though, the government brought this in, and then what they argued to the jury was, and in closing, they mocked the defense attempts to point out that these were not reliable records. In closing, the government said, $1.7 million, well, okay. In cross-examination, perhaps they disputed $700,000, so it's a $1.65 million loss. Anything that big cannot be based on legitimate reasons. And ordinarily, you might be able to say, well, you know, defense, you have a hard road to hoe here. But in the sentencing proceedings, which went on from January of 07 through almost 12 months before there was a final sentence in this matter, the issue that was repeatedly addressed by the district court with the government was, can I rely on the Bernison Report for a loss or a gain calculation? And ultimately, under a lower standard of proof— There's no difference there, right? Because as to the jury, it didn't matter exactly how much. It just mattered that it was not—that some of it was not legitimate. As to the sentencing, it did matter exactly how much. Well, I would disagree with that, Your Honor, in this sense right here. When you're in a jury like this, this court has passed a term in that. In a trial that is complex with a lot of moving parts, perhaps somewhat amorphous, that there isn't cause to reject the reliability of the verdict because of the proper addition of evidence or the well-handling of the case by the court. This isn't that case. This trial had 30 witnesses by the government contradicted by 30 witnesses for the defense. And then what you have in this is what the district court later determined to be an unreliable figure, an unreliable number that was placed in front of the jury and argued that there was a $1.7 million loss to Boeing in this case. My understanding, even from your report, of what was argued was that— not that there was necessarily a $1.7 million loss, but that there was $1.7 million in non-accounted-for shipping and that that amount couldn't all be legitimate. Not that $1.7 million of it was not legitimate. That's your report of what was said. That's not what the government argued to the jury, Your Honor. They took this report, regardless of how you and I would characterize it here today, they took this report and, in closing and in evidence, argued to the jury that there was a theft or a loss to Boeing of $1.7 million. And, again, proceeding in the sentencing phase of the case under a lower standard of proof, the court rejected the reliability of that report and those numbers. Briefly, Your Honor, I would like to talk about— well, I'm just going to mention two other things very quickly. Frank Palminteri was—it's based on the limitations that were placed upon the defense regarding their ability to present a defense in the context of theft of honest services. Although the door was opened by the government, a gentleman by the name of Frank Palminteri, regarding the difference between tail and main rotor blades that were sold by his company to South Korea, when the defense attempted to articulate for the jury and in front of the jury that the reason why South Korean, which was one of the hugest purchasers of Boeing product, did not want to purchase product from Boeing because their product was defective, had an abrasion strip that caused there to be a short-term life on the part and it caused safety problems, which would have gone directly to whether or not the defendant, and particularly Mr. Buckner, was in competition with Boeing by purveying these parts. The district court refused to allow that testimony. What was Mr. Palminteri's affirmative testimony? I'm sorry, Your Honor. What was the thrust of Mr. Palminteri's affirmative testimony? His affirmative testimony was on five tail rotor blades that were shipped in addition to 40— I believe it was 41 or 44 other trail rotor blades and whether or not those were properly received by him and then shipped to the South Korean government. But as part and parcel of that, the government opened the door as to whether or not he was purveying blades to South Korea, both tail rotor blades and main rotor blades. And the charges encompassed that as well. They encompassed Mr. Buckner selling tail rotor blades to the South Korean government. Your Honor, I see I'm coming up on my time here. As a result of that, it was an issue as to whether or not the sale of tail rotor blades, which the South Korean government did not want to purchase from Boeing because they felt that Boeing's blades were inferior, whether or not there was actually competition between the two. It goes directly to the heart of whether there was theft of honest services, and it goes to the competition issue under that argument. Your Honor, if I may, I'd like to reserve at least a few seconds for questions. Thank you. May it please the Court, good morning. Good morning. My name is Jeffrey Ross, and I represent Mr. Reagan in connection with these proceedings. This is my argument, so to speak, and one is the checks and tax returns argument, and the other one had to do with the jury instructions. With regard to- Yeah, I mean, no counsel on this argument at all, but since your time is limited in reading the briefs, it seemed to me that your arguments about the checks and tax returns were inconsistent. On the one hand, you argued that standing alone may mean nothing because no one introduced anything about whether the income should be reported. On the other hand, you argued that they were introduced to show that Mr. Reagan and Mr. Butler were bad men. Which is it? A failure to articulate it more clearly is certainly my responsibility, Your Honor. My position is that the checks should never have been admitted because they were not relevant. The relevancy of the tax returns, the government's theory for admission of the tax returns, was that the money that was reflected in those checks was not reflected in the tax returns. So the position that we take is that the checks never should have come in in the first instance, and as the checks go, so go the tax returns. Why? The checks should not have come in, Your Honor, because there was absolutely no evidence to support their admission on a relevancy ground. They certainly satisfied because they came in as bank records from different sources under 902. That issue was never disputed. There was a lot of dispute, however, about the fact that the government did not bring in anyone who was involved in the operation of the checks, the signatory on the checks, or anyone who could enlighten us whether the clients received the money. Mr. Steele? How do you speak about whether your client received the money? I think the government's point was that there's money coming in. Money doesn't usually come in by accident. There must be an explanation for it, and the government was trying to use that to demonstrate it was coming in for bad reasons. Well, that was certainly not relevant. Well, the government's argument ignored, and this connects up with my issue with regard to the community and the failure to call in the two gentlemen who allegedly wrote the checks for the two different service centers as to what the purpose of those checks was. That's a different argument. I'm still trying to figure out why is it not relevant that money is being poured into somebody's account? Well, when there's no reason to believe that money... If there's really no reason to believe, then the jury's got an easy acquittal. If you say, John Smith put money in the account, end of story, no more evidence, nobody gets convicted of anything. So to tell me, well, there's no reason to believe, I don't know of any rule that requires every single check to be explained by the source of the check. Their point was that money's come into the account. Sounds pretty relevant to me. Why is it not relevant? Because there was no one to articulate, other than with speculation, what the purpose of those checks was. From these service centers. We know who it was coming from. Correct, Your Honor. And some of it was going to spouses and other people not directly to them. That's correct, Your Honor. And it was not reported on the tax return, which suggests some legitimacy. And that's a pendium of information, has some circumstantial relevance. Our position has been throughout, and I'm sure the court has read through the various arguments we had at the district court level about the fact that the people who know what the purpose was were not called to testify. And it's a testimony. But that is an immunity question. And that to me is the more interesting issue of this case. Your problem, as I understand it, is if they had testified, then you could have compelled the immunity, right? Or you think you could have. Well, we certainly tried. If they had testified. And you have, with regard to one of them, you have no proffer. But with regard to the other one, so I don't know how you could get anywhere with him. But with regard to the other guy, you have a very specific proffer as to what he would have said. That's correct, Your Honor. So on the other hand, the case law seems very specific as to the very narrow circumstances in which. And you're strong. You're right. So the question is, what would you argue to us about why this might be another circumstance, given the odd way, I mean, it's at least odd in which the checks were introduced. We sort of know why. It had to do, presumably, with this problem. So, because ordinarily, they do put on whoever wrote the checks. And they didn't do that here. And they got, therefore, less out of it than they might have otherwise, right? Because all they have was some inferences, and they don't have any actual testimony. That's correct, Your Honor. Well, as I understand, Mr. Traub, there basically is a two-part test. First of all, they have to show that the testimony from the individual would be reliable. But that the testimony from Mr. Jones, who was the individual on whom the property was provided, would satisfy that hurdle. Mr. Traub talks about that you have to go in one of two directions. You either have to establish that the prosecution intentionally caused the defense witness to invoke his or her Fifth Amendment privilege against self-incrimination. Assured our claim. You're not contending that, Mr. Traub. Well, I did argue that in the brief. I think that the stronger argument, I will certainly concede that the stronger argument was that it had the effect of causing a witness to invoke. The only problem that I candidly run into in that regard is that in the Straub case, there was this one witness, this Mr. Coleman, who said that he made a confession to him, and a Mr. Adams who said that he didn't. And there was direct contradiction. And the way in my analysis of the situation, my thought process, was that the failure of the government to call any witnesses, to put any meat on the bones of these checks at all, is equivalent, and I know I'm going really out of sphere here, but is equivalent to the argument the Supreme Court gave credence to in Rhode Island v. Innis, where they talked about functional equivalent of interrogation. The officers didn't necessarily have to ask somebody the question. The circumstances, how our circumstances would have been functional equivalent, is that the failure of the government to bring any of these to the general, or anybody from their companies who knew anything about the purpose of these checks, was the fault of the government. Innis, Adams, did that on the Straub, should have been acquired by the Supreme Court, for immunity. Does it matter that there were a bunch of immunized witnesses here? In other words, suppose nobody had been granted immunity in this case. Would that weaken your case? Would it matter? No. It's not a selective immunity claim. There is... I'm not going to stand in front of you today and tell you that that is... The witnesses who got immunity, were not necessarily witnesses who had anything to say about the checks. They had nothing to say about the checks, but the checks was Mr. Jones and Mr. O'Connor. What were the circumstances of Mr. Jones claiming his amendment? Was he charged with anything, or was he... He was told that he was an unindicted co-conspirator, and Mr. Brownlee, Joseph Brownlee, a lawyer from Downey Publix, was his attorney and came to court, and Mr. Jones came to court, pursuant to a government subpoena, and he was there, and he was there for one reason and one reason only, and that was if the district court denied the admission of those checks on our arguments about the purpose of the amendment, that Mr. Jones would get his way out of the community, and would get up on the government stand, and would say, I wrote these checks for this and that reason. That's the only reason. He was physically in the courtroom the very same day, the very same day that the checks were offered for admission. So then, how did it come up that you asked the district judge to grant immunity, or at what point was he asked to grant immunity? Was it during the defense's case in chief, or what? No, it was during the government's case, because Mr. Jones was physically there, and we asked the court to have a hearing while Mr. Jones was physically in the courtroom, and the court could ask whatever questions it felt were appropriate, and so could both parties. The judge denied that. He said, well, he's here on a government subpoena. He can go back to Louisiana, and we'll deal with it later. Later on in the case, the judge allowed Mr. Brownlee to come in and testify, and give me just a moment. I'll give you the pages where it was that Mr. Brownlee testified. Who was Mr. Brownlee? Who is Mr. Brownlee, Your Honor? Yes. He is Mr. Jones's lawyer. Oh, and he testified? He was allowed to testify about why it was that Mr. Jones testified at the hearing, not in front of the court, not in front of the jury. No, not in front of the jury. And it's on, in terms of transcript pages, it's about 2684, I believe, is where it starts, and it was a hearing that lasted 10 or 15 minutes. The end result of that was that not only did the government not grant us immunity, or grant Mr. Jones immunity, but the court denied the request. And when you look at the check situation, together with the immunity situation, and how critical the checks were to the government's case, they were 30 of the overt acts in the conspiracy jury. They were all 16 of the acts of wire fraud, and they were all 8 of the counts of money laundering. So the checks themselves were the whole body of the government's prosecution of this case. And had the checks gone out, so would the government's case. Time. I apologize, I didn't even get to talk about one of my favorite topics. Thank you, and we'll give you each a minute or so. Thank you. Thank you. Thank you. Thank you for appearing on behalf of the United States. Of course, Commissioner, I'll start with any of the issues, since that's the most recent one. It's the government's position that the checks were direct evidence of the abuse, and therefore, they were not charged in a vacuum, and therefore, they were not court-ordered evidence. They were relevant, and their relevancy is the same. Well, they were also charged as overt acts, and as money laundering counts, and as wire and mail fraud counts. So they were actually direct evidence of those offenses. It's the government's position that the evidence was not entered in a vacuum, because in this case, there was prior testimony by other individuals from the companies of PRISM and Halimart and Voter Wing that all set, and EXPECTS as well, that set forth that Defendant Buckner had contact with them, had negotiated with them, and through those negotiations, had secured for himself up-front kickback fees in order to send free products to those particular service centers in exchange for the kickbacks and for monthly payments. And it's the government's position that those checks, when you had the money coming in from HPS and from EMHL, set the scene for what those payments were for. The government had subpoenaed Mr. Jones of HPS solely as a custodian of records. The government issued the subpoena to the custodian of records, and Mr. Jones indicated that he was the only custodian of records for the company. Therefore, the government brought him to Phoenix in the event that the district court did not allow the checks and tax returns to him. And you established that for him to testify, even as to that, he would have had to be granted immunity? Yes. Yes, absolutely. And there was testimony from Mr. Brownlee to that effect, that the court had previously quashed the subpoena because Mr. Jones had invoked his Fifth Amendment privilege with regard to protection of documents. So what? I mean, so the government was willing to grant this man immunity if it was to their benefit and they needed him. And then we have this proffer which suggests that he was going to refute basically all these circumstantial suggestions, and then the government can simply say, for that we're not going to grant you immunity? In other words, the one thing we know as a result of this strange record is that their refusal, their decision to grant him immunity or not to grant him immunity didn't seem to be based on how, on a desire to actually prosecute him particularly. Well, I would disagree with that because he was noticed as an unindicted co-conspirator as early as 2003, which is a year before trial. And at that point, his attorney advised him to plead the Fifth with regard to protection of any documents or any testimony in the case. But the government was willing to grant him immunity if they needed him as the custodian of records. We don't know that. That's why I asked you that. Then I misspoke. I apologize. Because the government was advised that he was going to invoke the privilege with regard to protection, and therefore the court did not obligate him to produce the records. All right. Okay. Who was the subpoena addressed to? To the custodian of records. Of? Of HPS, Helicopter Parts and Services, Mr. Jones's company. Was that a corporation? I don't know. I know that Mr. Jones was the owner of the company, and the record says that he represented himself as being the only one, the only person in the company that could produce the records as the custodian, if that answers the court's question. Well, this is sort of a tangent, but I'm puzzled. If it's a business entity, I'm not sure that he's got the right to refuse to testify as custodian. But that's something of a tangent, so I'll let it go. And I apologize. That wasn't raised, so I'm not really familiar with that aspect of it. But what I can tell the Court is he was brought in and made available or he was subpoenaed for purposes of providing background and foundation for the checks as custodian of the records only. That was the sole purpose for which he was subpoenaed by the government. So we don't know whether the government was prepared to give him immunity to do that. Correct. We don't know. Or even in terms of Judge Clifton's question, whether it would have had to or whether he could have testified in another capacity as to which he couldn't have been cross-examined in his own capacity. Correct. And his attorney represented to the district court that the production of the documents would give rise to his Fifth Amendment privilege, and therefore, that's why he was going to invoke. And so he would have invoked it even with regard to simply producing the records. Correct. With regard to the immunity issue, though, this Court in Straub has said that it's an elements test and you don't get to the purpose effect question of distorting the fact-finding process unless you've met the other elements. The other elements are ---- This really did distort the fact-finding process, Ginger. I would suggest that it didn't, and the reason being that the checks didn't come in, as I previously stated, in a vacuum. Those checks were background. And we already knew from witnesses Don Nichols and Jerome Petrosky of Halimart that defendant had offered Mr. Petrosky a cut if he bought product from Mr. Jones' company, HPS, and that Mr. Petrosky received checks from HPS and EMHL, both the subjects of this issue, because he did business with Mr. ---- with defendant Buckner through Halimart in purchasing from HPS and EMHL. So there was background information from which the jury could say, okay, we know that EMHL and HPS gave kickback money to Mr. Petrosky for dealing with Mr. Buckner through these two companies. But as you said earlier, the particular checks were also the subject of particular charges, right? Correct. And Mr. Jones apparently was prepared to testify that at least, I don't know if it's all or many or whatever, but a lot of these checks were not what they appeared to be. And he had explanations for them, which would have been inconsistent with the charges. Is that not right? It's not exactly right. And what I'm disputing is this. Mr. Jones was going to testify that one $24,000 check was a commission payment for Cessna parts. Now, he was going to testify that three HPS checks were to the casino for payments for his debts to the casino on Mr. Buckner's line of credit, and he was willing to testify that checks to Sun Life and Penn Mutual were for consulting fees on a contract that Mr. Buckner was negotiating that never came to fruition. The district court found that the casino issue, those checks were more appropriate, were inadmissible hearsay testimony regarding that, that it should have been the casino witnesses that testified as to what those checks went to, as opposed to Mr. Jones's purpose in writing the checks. With regard to the $24,000 check on the commission payment, the government submits that there were other witnesses available that could have testified to that because there had to have been another party on the other side of the Cessna parts sale that could have testified that Mr. Buckner was involved in that transaction with Mr. Jones. In addition, the checks that went to Sun Life and Penn Mutual for the consulting fees, again, they could have brought in one of the witnesses to the transaction from Korea. And while that may sound like it's an undue burden, the defense actually brought in a witness from Korea with regard to other transactions, so it wasn't an undue burden to have brought in those people. So your basic position is that he was not essential for any of these purposes? Correct. But I – What if he were? I would still say that we don't fit within the Straub case because Straub tells us, and that's specifically at page 1160, 1159 to 60, where they're talking about the Lord case, the Westerdahl case, and the Baker case. And they said, in Lord, we never reached the purpose effects question because Lord was based on the interference with the Fifth Amendment privilege issue. In Westerdahl, you had a case where one witness directly contradicted that of another witness. One was granted immunity, the other was not. So this court remanded and said, the court needs to make a finding with regard to the purpose effect issue. In the Baker case, though – I asked this question before. Is it critical to the Straub theory that the person who was directly contradicted had immunity? What if he didn't have immunity? It's absolutely critical because, as I said, on page 1160, the court specifically says, it is equally clear that our jurisprudence has anticipated endorsing an effects test where the other elements of the test have been satisfied. And the government submits that in light of the previous discussion by the court of Baker, of Lord, of Westerdahl, that the court is saying, unless you have met those other elements, we don't get to the purpose effect aspect of the test or element of the test. And in this case, we do not reach it because, first of all, we do not have contradictory – we don't have other witnesses that were granted immunity with regard to the check testimony. Second, we don't have directly contradictory evidence being produced by any of the government witnesses. We do have – immunity was granted, and we agree, but it was five out of the 38 witnesses that the government presented, none of whom testified about these checks. They testified, as I previously stated, about other circumstances, which the jury could then infer that a similar circumstance was going on with regard to Mr. Jones' HPS and these checks, but they did not testify directly with regard to these checks. So we simply don't meet those first two elements of a government witness being granted immunity and directly contradictory testimony by that witness. And so the government submits, we never get to the purpose effect element of this test. Well, we're still in the neighborhood. Let me ask about a slightly different subject, and that's the tax returns. What's the relevance of the tax returns? The relevance of the tax returns is that we have income to Mr. Jones – I'm sorry, we have income to the defendants that was not reported on their tax returns, which is circumstantial evidence of their intent to defraud because it's concealment of assets. But it's not being concealed from Boeing, and Boeing doesn't get the tax returns. It sounds to me like more of a separate crime than concealment here. But it's – well, but the government submits that concealment of assets when you have kickback payments being paid is circumstantial evidence of the intent to defraud because we have to show that they were intending to defraud Boeing and by secreting the fact that they were getting payments from Boeing service centers for some reason and not putting them on the tax return is evidence that they were involved in a fraud as opposed to some kind of legitimate transaction. I've heard the argument before. I've even seen it. It's read in court decisions. As a personal matter, I'm not much persuaded by it, but that's a personal matter. Would the courts – okay, I'll go on to the Bernison report. Okay. I would be – oh, I'm sorry. Well, I would like eventually for you to get to the Palminteri cross-examination question, too. Oh, certainly. I'll go to that one right now if I can just have one second. Defendants contend that by restricting cross-examination of Mr. Palminteri, that they were prevented from presenting a defense theory. The record belies that argument because Mr. Palminteri – or the district court never ruled that Mr. Palminteri couldn't testify with regard to the issues that defendants were attempting to raise. What the court said is, you're confusing the jury by raising it now in cross-examination. That sounds to me like more of a matter to be raised in your own case. And thereafter, the defendants called 28 witnesses. In fact, they called a Korean witness who testified to problems with the Boeing tail rotor blades. They called another witness who also testified to problems with the Boeing blades, but they did not call – Where did the court say that you could – you know, you can put it on later? And was that realistic? Where – That would be at S.E.R. 62 to 84 in that colloquy that took place. Trial transcripts 13-14, 13-14 to 13-16, and 13-28. He said, well, I can come back. Mr. Palminteri came in for counsel. Well, he can come back. Is that what you mean? Yes. Well, he also said – excuse me one second. If you'll allow me one second. I'm sorry. On 13-28, right. Well, we've got the Korean determination from a Korean, if it's relevant. And I don't think it is at this moment in the trial in any event, Mr. Fetter, for the reasons I've stated. If the matter goes forward into a defendant's case, then maybe it will have some other meaning or purpose or be better presented there. But right now, it's simply going to confuse, mislead the jury, and take up time. So the court wasn't precluding Mr. Palminteri from testifying. Mr. Palminteri had already come to testify, even though he was testifying under immunity, but it was a blanket immunity agreement, so he would have had to testify on behalf of the defendants had he been called. And they were not precluded from recalling him in their case-in-chief. In the defendant's case-in-chief, that's correct. All right. Okay, and then we're going to go on to the Bernison Report. With regard to the Bernison Report, there was significant foundational testimony that the information in the sales orders constituted a computerized business record. Mr. Bernison provided testimony with regard to the database that was created and the fact that he specifically selected the sales order software. The witnesses testified that the information was collected with regard to sales orders, immediately entered into the computer, that the computer calculated what the price of the items would be, and that Boeing relied on those sales order records in the computer in order to conduct its business and to provide information regarding inventory and what was in stock. Mr. Bernison was asked to create three different records based on the information in the database. With regard to the sales orders from HPS and EMHL, the underlying documents with regard to those sales orders constituted 18 boxes worth of documents. Those were made available to defendants prior to trial, and it's my understanding that defendants don't dispute the fact that those were made available to them. What Mr. Bernison did was run company-owned software against the sales order database, and he produced, based on that, three different reports. One is all sales orders that were between HPS and Boeing for the period 1996 to 1999. The second report was all sales orders between EMHL and Boeing for the same time frame. He ran another report, which was the no-charge or zero-dollar entries or lines with regard to both of those companies for the period 1998 to 1999. He explained that those line orders are not transactions, they're not shipments. The computer simply went through and called out from the other two exhibits, the one with all the HPS sales orders and the one with all the EMHL sales orders, and called out of those the lines of a product that went out at no charge. Defendants, through the 18 boxes of materials, were able to attack a couple of those underlying transactions, one being, I believe it was Defense Exhibit 160. In fact, meaning demonstrate that they were in fact paid for or demonstrate that they were legitimately not paid for? That on that one transaction, they demonstrated that it was an exchange, and so it actually went out legitimately. But the court found that in light of the sheer numbers of material, that being able to point out a couple of inaccuracies went to weight of the evidence and not its admissibility, and the defendants were therefore able to cross-examine on any information that may have undercut the reliability of the reports created by Mr. Harris. And did the report have a bottom line? I mean, did it say at the bottom, did it add anything up or come up with an ultimate number? Yes. And what happened with regard to that is, if I can just find it in my notes, that between 1998 and 1999, that EMHL received $659,000 in free product while paying only $1.25 million, and that during the same years, HPS paid $2.3 million and received $1 million in free product. And a government witness testified that those were excessive, unexplainable numbers, surely because of the amount of no-charge items going to those two service centers. But there was no effort to say that any particular one of those items was necessarily illegitimate. Through this report, it might be proven otherwise, but the report only demonstrated that it was a zero. A zero-dollar line item went out with no explanation. The defendants have argued that this was unreliable information, and they looked to the sentencing transcript to say that. But if the court actually looks at that page of the sentencing transcript, it says no such thing. It doesn't even reference the Bernison report. What the court actually said was that it chose to use gain to the defendants in order to establish the guideline element as opposed to using a loss figure. And those are two different things, because using gain to the defendants was an easier thing for the court to do than to calculate the losses. So I submit that it doesn't undercut the admissibility of the Bernison report. If that makes sense. Thank you very much. I've gone beyond my time. Otherwise, the government would sit in on the briefs. Thank you very much. I appreciate the argument. Sir. Your Honor, let me say very briefly and allow Mr. Ross to finish up on the immunity question. On the Bernison report, Mr. Bernison testified that the report was prepared based on criteria provided to him by the government, that they were not records that were kept in the ordinary course, not only his report, but some of the underlying records, that the information that was input into those underlying records was pursuant to a process that was not consistent and was subject to after-the-fact modification. And that the report did not accurately reflect. If the government had simply submitted the Boeing records, say the, I don't know what the formula would be, but I suppose bills or something, would that have been okay? If they had submitted the underlying records, they never got to that point, because there was no foundation established for that. So would that have been okay? Perhaps that would have been okay. What they chose to do was present a summary, which Mr. Bernison conceded under oath, that did not accurately reflect the underlying documents. He stated that in open court. My report does not accurately reflect the information. What does that mean? I'm missing that. In other words, Your Honor, after a cross-examination by Mr. Kelp, in which Mr. Kelp established that, you have this zero-dollar figure, but you don't know that that's a loss to Boeing. You don't know if this part shipped or anything else. That's true, but why didn't it reflect the underlying records? Because, as the government has stated, the bottom-line conclusion that was argued to the jury and that was presented as a fact was that, as to one parts distributor, there was $659,000 in change, a very specific number, that was a loss to Boeing. A loss to Boeing or a zero-dollar sum? I thought you could challenge that. It didn't seem to establish that. But why does it have to do with the record? Well, and again, that's why I talk about looking at this through a lens of whether or not you have reliability in the verdict. If it was just put out there in the sense, first of all, we don't think the report should have been admitted under the circumstances that it came in. That's obvious. That's been my argument the entire time. But if the jury has argued by the government and presented to them that this report from a Boeing employee reflects a very specific $1.7 million in change to the penny lost to Boeing, and that's presented to them as a fact, and when you have the person who created the report that says, if you look... Does that fact matter to the verdict? I think it does. Whether it's $500,000 or $1.6 million? It does in the context of everything else. You talk about the checks. The government places the checks in the context of the Burnison Report. These checks are meaningful because we have a $1.7 million loss from the Burnison Report. Everything was disputed in this case. Everything was quibbled. And ultimately what the jury is told, we have this massive information, but we want you to look at it through the lens of this $1.7 million loss to this company. And when Ms. Rufinock says that it's a throwaway line in the sentencing proceedings, that's not the case. There were six hearings. We appeared in front of Judge Carroll on a number of occasions in which this issue, he beseeched the government and Boeing, present me with information so that I can substantiate the report because I want to use a loss calculation. He was begrudgingly brought to a gain calculation because he never had anything to indicate that the loss figures were reliable. Thank you very much. Mr. Ross. I think the Court has hit the nail right on the head on this immunity issue. And I think a careful review of the language in Straub substantiates our position. Well, what about the representation that all of this could have been proven otherwise? All of what, Your Honor? All of it. Whatever Jones was going to testify to could have been proven otherwise. That's what I understand this ultimate answer to be, or at least what is the ultimate answer to be. Well, that's not how I heard it, but I certainly could have misheard it. There is no, certainly within a courtroom, and actually... The casino employees could have testified. The Koreans could have testified, et cetera. Jones wasn't essential. But Jones would have been essential because Jones wrote the checks and he would be able to articulate his purpose for writing the checks. Whatever the people at Sunset, whatever the people at Penn Mutual, whatever those folks might have to say about the purpose, that would be one thing. And maybe the two would be the same. But certainly Jones could come in just the way that I could come into court and you could ask me, well, Mr. Ross, what did you write this check for to this doctor? And I'd say, well, I wrote this check... I think the government's point is that there were other people that could have testified with regard to there being other transactions for which Mr. Buckner was to receive a fee as consultant. Immunities, it's not hard to figure out why immunity isn't freely distributed to the defendants because it's easy to give somebody the right to come in and say it wasn't him, it was me. That's not the way it works. You need to show a lot more than that to be able to compel immunity to be granted. And in this case, the government has said to us that they could have proved these other transactions in other ways and did not do so. Is it possible you could have proved the existence of these other transactions? Well, I have a copy of the offer of proof that was submitted as part of the record. These were checks, specific references to checks that were written to Buckner in exchange for services that he provided and consulting services that he provided. And to Mr. Reagan for that same purpose. And, in fact, we had expert testimony. I think I'm looking at the same thing you are. It's the 1227 checks to Sun Life and Penn Usual. This payment was expected, the contract was expected to generate revenue on the quarter of $250 million. It was brought together by Buckner who acted as a consultant. These were consulting fees. Well, if there are parties out there coming together for a deal that's supposed to be a quarter of a billion dollars, presumably there's somebody out there that can testify, yeah, we were trying to put together this transaction and Buckner was a consultant to it. That may answer the question. There were 20 checks involving Mr. Buckner. The court is focusing on one or two of those checks. The vast majority of those checks required either Mr. Jones or Mr. McFarlane to physically appear in court and tell the court and tell the jury why it was that those checks were written. And this was a game the government was playing. Jones was there ready to go if the judge was not going to admit the checks. Once the judge said the checks are coming in, goodbye Mr. Jones, thank you very much, here's your ticket back to Louisiana. And it's exactly the kind of gamesmanship that Straub talks about. It's exactly the kind of stacking the deck that Straub is talking about. And the ultimate result is the loss of the due process rights of the defendants to a fair trial and to present the defense in their case. Thank you very much. Thank you, counsel, for a very useful argument in a very complicated case. And we are adjourned. The case of United States v. Reagan and Buckner is submitted and we will adjourn until tomorrow morning. Thank you.
judges: Dw Nelson, Berzon, Clifton, Cjj